## PARKER RUST PROOF CO. v. FORD MOTOR CO.

District Court, E. D. Michigan, S. D. January 17, 1928.

No. 424.

**1. Patents �köß227—Recovery for infringement of patent begins from time plaintiff gave defendant notice, though defendant previously knew of infringement (35 USCA § 49).**

That defendant and its predecessor had actual knowledge that it was infringing patent did not entitle plaintiff to recover damages or profits for entire period of such knowledge, but proof was required to show that defendant was notified by plaintiff of infringement, and recovery begins only from date plaintiff gave notice specified in Rev. St. § 4900 (35 USCA § 49; Comp. St. § 9446).

**2. Patents ⊙ß319(4)—Plaintiff held entitled to interest from end of each year patent was infringed to date of master's report on damages found each year.**

Plaintiff *held* entitled to interest at 5 per cent. per annum from end of each year patent was infringed to date of master's report, on amount found by master to be damages for each year.

**3. Patents ⊙ß318(1)—Plaintiff could not recover defendant's profits on sales of articles processed with infringing process, or defendant's savings in using infringing process itself, where defendant could have used other processes.**

Where defendant infringed plaintiff's patent for rust-proofing iron or steel by ravenizing its products, plaintiff *held* not entitled to profits on defendant's sales of ravenized articles, or saving made by defendant in itself ravenizing parts, instead of having them rust-proofed at plaintiff's jobbing plant, where defendant could have enameled parts, or processed them according to other formulas, although not as satisfactorily.

**4. Patents ⊙ß319(1)—Where plaintiff's licensees had right to use process patent in suit and 11 others, alone or in any combination, at same royalty, plaintiff was entitled to royalty for infringement of process patent alone, based on license fee.**

Where licenses under which plaintiff's licensees operated granted rights under 12 patents, including process patent in suit which defendant infringed, but process involved was covered by patent in suit, and dominated all the other patents, and plaintiff's licensees were permitted to use any processes covered by the other patents, or to use process of patent in suit alone, without any modification in royalty fees or cost of materials, plaintiff was entitled to reasonable royalty, based on license fee de-

fendant would have paid, for infringement of patent in suit alone.

**5. Patents ⊙ß319(1)—Prevailing license rate for infringing period is measure of patentee's damages.**

Prevailing royalty or license rate for infringement period is measure of patentee's damages, and fact that, before plaintiff purchased patent in suit, patentee granted shop rights under patent at considerably lower rates than were in force during infringement period, did not affect measure of damages.

**6. Patents ⊙ß319(1)—Plaintiff held entitled to expense unnecessarily forced on plaintiff in infringement suit by character of defense.**

Where plaintiff was compelled to expend large sums during infringement trial and during accounting, because of character of defense, and defendant's declared opposition to paying any royalties to any one, plaintiff *held* entitled to expense unnecessarily forced on him.

**7. Patents ⊙ß319(3)—Concealment of infringement, and continued infringement after notice, did not warrant award of treble damages.**

Concealment of patent infringement by defendant and its predecessors before notice, and continued infringement to greatly increased extent after notice and knowledge thereof, did not warrant award of treble damages.

**8. Patents ⊙ß319(3)—That defendant's superintendent established plant using infringing process after notice of infringement did not warrant award of treble damages.**

That defendant's superintendent established plant in another's factory for rust-proofing articles produced for defendant by process which infringed plaintiff's patent for rust-proofing, after defendant had notice of infringement, did not warrant award of treble damages.

In Equity. Patent infringement suit by the Parker Rust Proof Company against the Ford Motor Company. Decree for plaintiff in accordance with opinion.

Alexis C. Angell and Edward N. Pagelsen, both of Detroit, Mich., Burt D. Chandler, of Hudson, Mich., and James H. Cornelius, of Adrian, Mich., for plaintiff.

Barthel, Flanders & Barthel and Homer C. Underwood, both of Detroit, Mich., and Walter Clyde Jones, Arthur A. Olson, and William J. Dowd, all of Chicago, Ill. (Otto F. Barthel, of Detroit, Mich., of counsel), for defendant.

TUTTLE, District Judge. This is an infringement suit, based on letters patent No. 870,937, granted November 12, 1907, to J. W. Coslett, for improvements relating to the treatment of iron or steel for preventing rusting, and is before this court on exceptions to the master's report on the subject of damages and profits. Claims 3 to 6, inclusive, of this patent, were before the court, and

were found valid and infringed by the ravenizing process employed by the defendant and by the sale of its ravenized products. 6 F.(2d) 649. This word "ravenized," is here employed to designate the specific embodiment of the Coslett invention, practiced at the plant of the defendant at Highland Park, Mich.

The Ford Motor Company, a Michigan corporation transferred all of its assets to the Ford Motor Company, a Delaware corporation, on May 1, 1920. The stock ownership of the two corporations was not the same. Defendant insists that no award may be made to the plaintiff against the Delaware corporation for any acts of the Michigan corporation occurring prior to May 1, 1920, the date of acquisition of the business by the Delaware corporation. A decision of this question is made unnecessary by the holding of this court, later discussed, on the subject of notice to the defendant.

The patent in suit was purchased by the plaintiff on December 2, 1916, and the record shows that the Ford Motor Company, the Michigan corporation, began infringing on January 1, 1917. In December, 1916, Mr. Barthel, chief patent counsel for defendant and its predecessor, ordered a copy of the patent in suit from the United States Patent Office, and at the argument on the exceptions to the master's report, before this court, counsel for defendant conceded that this copy was procured for defendant's predecessor and was the subject of a consultation with the legal department of defendant or its predecessor, between 1918, at the earliest, and 1920, at the latest. At · this hearing on the exceptions to the master's report, counsel for defendant were given an opportunity to show that defendant was informed at that conference that it was not infringing this Coslett patent, but this opportunity was declined; counsel for defendant asserting that the conference was privileged. The master found that defendant and its predecessor received and had actual knowledge of the patent in suit prior to January 1, 1917, and that they concealed the knowledge of their infringement from plaintiff until September 9, 1920, prior to which time plaintiff had no knowledge thereof. This court is satisfied that defendant was informed by its own counsel that it was infringing the patent in suit by the use of its ravenizing process.

During the infringement trial, defendant showed that its ravenizing process was a secret known only to three men, one of whom had died just before the trial, and that no other person was admitted to the room where the ravenizing solutions were prepared.

[1] The master's finding that prior to January 1, 1917, the Ford Motor Company, a Michigan corporation, and that from and after May 1, 1920, the defendant, a Delaware corporation, received and had actual knowledge of the patent in suit, and that these two corporations concealed from plaintiff knowledge of their infringement, and that until September 9, 1920, plaintiff had no knowledge thereof, is approved. However, the fact that the defendant and its predecessor had actual knowledge that it was infringing the patent in suit does not entitle plaintiff to recover damages or profits for the entire period of such knowledge. Proof is required to show that the defendant was notified by the plaintiff of the infringement, and recovery begins only from the date when plaintiff gave the notice specified in section 4900 of the Revised Statutes (35 USCA § 49; Comp. St. § 9446), which was on September 9, 1920. Muther v. United Shoe Machinery Co. (D. C.) 21 F.(2d) 773; Westinghouse Electric & Manufacturing Co. v. Condit, etc., Co., 159 F. 154.

From the time it started in business, plaintiff's income consisted of license fees paid by others for the right to use the rustproofing processes set forth in its 20 or more patents, all based on the patent in suit, in the profits it made on the materials used by its licensees in such processes, and in the profits it made in its jobbing plant rustproofing articles of iron and steel for others. Its uniform license contracts provided for annual payments, depending upon the sizes of the processing tanks used by the licensees; the rate during the period from September 9, 1920, to November 12, 1924, being as follows:

For the first 1,000 gallons of capacity, $1 per gallon per year.

For the next 2,000 gallons of capacity, 75 cents per gallon per year.

For the next 2,000 gallons of capacity, 50 cents per gallon per year.

For the next 2,000 gallons of capacity, 25 cents per gallon per year.

For all additional capacity, 12½ cents per gallon per year.

The licensees were obligated to purchase the materials used in the rust-proofing process from plaintiff, the clause in the contract being as follows:

"It is made a condition of this license and of the licensee's right to use and apply the patents, inventions, methods, and processes hereinabove referred to, or which may

hereafter be disclosed or revealed to it in writing or otherwise by the licensor, that the licensee shall, and it hereby covenants and agrees, in the exercise of this license and the rust-proofing work conducted thereunder, to use in such rust-proofing only, Solite, Parkerol, and Hyro acid compound; and such other mixtures, compounds, solutions, acids, or other material as shall be prepared, recommended, furnished, or supplied only by the licensor and desired by the licensee for such rust-proofing; and the licensor agrees to furnish and supply to the licensee, upon the latter's formal orders during the continuance of this license, all the licensee's requirements of such Solite, Parkerol, Hyro acid compound, and such other mixtures, compounds, acids and other material for rust-proofing, and the licensee agrees to pay for the same at the prices and on the terms set forth in the annexed schedule A, which is made a part hereof, said prices being the same prices charged by the licensor to all other licensed manufacturers using the licensor's rust-proofing inventions, processes, and materials in like quantities and under like conditions; said prices are subject hereafter to change by the licensor, but all changes therein, whether increase or decrease, the licensor agrees shall be uniform and without discrimination among all licensed manufacturers dealing on the same basis as the licensee herein."

But the licensees were at liberty to use, not only the original Coslett process, but any modification thereof set forth in the other patents owned by plaintiff. The license rate, however, did not vary.

In order to determine the amount which defendant would have paid plaintiff, if defendant had operated under a license based on plaintiff's patents, the master took into account the number of pounds of acid used by defendant and its tank capacity, and the revenue derived by plaintiff from its other licensees in the way of license or royalty fees and the profits on the acids and other materials sold, and applied plaintiff's sliding scale to arrive at a proper factor to be used.

The record shows that the royalties received by plaintiff, reduced to a factor per pound of acid used by a number of its larger licensees, varied from 41.9 cents per pound to 21.7 cents per pound and the master accepted the testimony for plaintiff to the effect that, had defendant operated under a license, the factor to be used would have been 12.6 cents per pound of acid used when converted to 50 per cent. concentration. The

amounts determined in this manner by the master were:

| | |
|---|---|
| May 1, 1920, to December 31, 1920 | $25,003.23 |
| January 1, 1921, to December 31, 1921 | 32,329.86 |
| January 1, 1922, to December 31, 1922 | 61,646.34 |
| January 1, 1923, to December 31, 1923 | 68,170.12 |
| January 1, 1924, to November 12, 1924 | 49,792.07 |

The first figure covered the time from the date the Ford Motor Company, the Delaware corporation, took over the business of its predecessor; but, as this was prior to September 9, 1920, the date of actual notice, this figure should be reduced from $25,003.-23 to $12,650, and the total then will be $224,588.39.

[2] The master allowed interest on the total amount found for the plaintiff from November 12, 1924, the date of expiration of the patent in suit, to the date of his report. Plaintiff's licensees paid their license fees at the beginning of the license year and paid for their supplies as they were purchased. Defendant would have done the same had it taken a license. Plaintiff should therefore be allowed interest at 5 per cent. per annum from the end of each year to the date of the master's report on the above amounts for each year after actual notice.

| | |
|---|---|
| For 1920 | $ 3,921.50 |
| For 1921 | 8,405.76 |
| For 1922 | 12,945.73 |
| For 1923 | 10,907.22 |
| For 1924 | 8,405.76 |
| | $44,585.97 |

In order to get a mental picture of the tremendous business of defendant, a few figures taken from the report of defendant's auditor for the period from January 1, 1921, to November 12, 1924, may be considered.

| | |
|---|---|
| Amount of sales for this period | $2,294,548,785.66 |
| Manufacturing cost | 1,891,925,681.60 |
| | $ 492,623,104.06 |
| Commercial expense | 55,343,844.95 |
| Profit | $ 337,279,259.11 |

During this period of less than four years, defendant ravenized 52,664,272 pounds of articles of iron and steel, and thereby infringed the patent in suit, at a cost of $655,-177.28. Had these articles been rust-proofed at plaintiff's jobbing plant, which competed with other rust-proofing plants for business, the cost to defendant would have been $1,-760,032.25. Defendant therefore saved $1,-

104,914.97 during this period by ravenizing its products, instead of having all of its work rust-proofed at plaintiff's jobbing plant. The record shows that plaintiff did process a mass of articles of iron and steel for defendant and for others who were producing parts for Ford cars.

During this period of 3 years, 10 months and 12 days, defendant sold individual parts, which it had ravenized, such as bolts, nuts, springs, and levers, to its distributors and service stations, and received therefor the sum of $1,445,730. The manufacturing cost and commercial expense of these articles amounted to $740,913.15, leaving a profit of $704,817.40 on these replacement articles alone.

Defendant also sold considerable quantities of assembled parts, each less than a complete vehicle, and each containing ravenized parts, at a total profit of $5,170,638.44. The estimated profits on these ravenized parts, based on the total profits and on the cost of production of the several parts, amounted to $58,694.85 for this period.

In the same manner, the estimated profits on ravenized parts incorporated in automobiles, tractors, and trucks made by the defendant during this same period, based on the total profits on such vehicles and on the cost of production of the several parts constituting such vehicles, amounted to $1,128,604.62.

These estimates were made by plaintiff's accountants and were based on data supplied by defendant's auditor and their accuracy does not seem to be disputed. The sum of these profits on ravenized parts sold individually and the estimated profits on ravenized parts of minor assemblies and of complete motor vehicles for this same period is $1,892,116.87. The amounts from September 9, 1920, to December 31, 1920, have not been considered.

[3] Plaintiff urges that the court should award it this amount, or at least a substantial portion thereof, as defendant's profits arising out of the infringement and due entirely thereto. There is no proof that defendant could not have enameled the parts which it ravenized, or galvanized them, or processed them according to other formulas, which are fully described in the accounting record, with some advantage. None of these other processes were considered by defendant as being as desirable as its ravenizing process, and none would have produced the shiny black finish which matched the black surface of the exposed parts of the Ford cars; but the advantages of the ravenizing process over the other processes are not demonstrated to

be so dominating as to warrant this court in awarding plaintiff either these profits on sales of the ravenized articles or the saving made by defendant in itself ravenizing these parts, instead of having them rust-proofed at plaintiff's jobbing plant.

[4] Defendant points out that the licenses under which plaintiff's licensees operated granted rights under 12 patents, including that to Coslett, and contends that, therefore, the reasonable royalty determined by the master should not be awarded for the infringement of the Coslett patent alone. Defendant overlooks two very important facts: First, the process of rust-proofing articles of iron and steel by means of a solution of phosphoric acid is covered by the Coslett patent, and dominates all the other patents; and, second, plaintiff's licensees were permitted to use any one or all of the processes covered by the other patents, or could use the Coslett process alone without any of the modifications set forth in the other patents, but in either event the royalty fees and the cost of materials remained the same.

[5] Defendant also points out that, before plaintiff purchased the Coslett patent, the patentee, Coslett, granted shop rights under this patent at considerably lower rates than were in force when defendant began business in May, 1920, and that, therefore, defendant's liability should be measured by these low rates. It does not claim that plaintiff changed the license rate after defendant was organized, or that defendant altered its method of doing business because of any change in rates. If defendant's argument were carried to its logical conclusion, a party who wrongfully takes possession of and uses for automobile parking a piece of vacant downtown real estate in the city of Detroit, worth say $500 per month, might claim that in 1840 such real estate was rented for $10 per year, and that therefore he should pay no higher rent.

The prevailing royalty or license rate for the infringement period is the measure of a patentee's damages, and not the rate at which the invention was licensed during an earlier period, when the patentee was willing to take almost anything to get the invention introduced. Whether Coslett granted the Westinghouse Company in June, 1911, an unlimited license at $720 per year, or granted it such a license for a 5-year term in September, 1911, for $1,452, or whether plaintiff granted licenses under other patents at lower rates, before it purchased the Coslett patent, than were in force in 1920 and thereafter, is absolutely immaterial, especially as the

defendant urges and this court holds that nothing which happened in the way of infringement before September 9, 1920, can be charged against it.

The findings of the master of reasonable royalties for the several periods from September 9, 1920, to November 12, 1924, are approved, but simple interest at 5 per cent. per annum should be computed on each amount from the end of its yearly period until the date of the master's report, making a total of $269,174.36.

[6] During the infringement trial, which occupied about 40 court days, the character of the defense was such that plaintiff was put to unusual expense to meet it. Defendant's experts repeatedly presented alleged and unforeseen results of extended experiments, and claimed to deduce therefrom either that the ravenizing of its products did not constitute infringement of the Coslett patent, or that the Coslett process was inoperable. It was then necessary for plaintiff's experts to check defendant's experiments, and in each case plaintiff showed that ravenizing was the process of the Coslett patent, and that the Coslett process was operable exactly as described in the specification of the patent in suit, no matter how such specification might be construed.

The defendant corporation, being one of the largest in existence, is doubtless made defendant in much unjustifiable litigation, and it may be good policy for defendant to make such litigation so expensive for its opponents that many intending contenders are deterred from bringing suits. There seems to be no doubt but that defendant spent upwards of $200,000 in the defense of this suit. The record shows, too, that Mr. Henry Ford, who dominates the defendant corporation, is absolutely opposed to the operation of the present patent system and to the payment of royalties to any one. This is clearly expressed by a statement made by Mr. Davis, defendant's patent attorney stationed at the plant: "There is no power on earth, this side of the Supreme Court of the United States, which would make Henry Ford sign a license agreement or pay a royalty." With these ideas in mind, counsel for defendant were quite successful in causing plaintiff to expend large sums ($49,933.07) during the infringement trial, according to data furnished the master, and substantially the same sum during the accounting, according to undisputed statements in open court. Plaintiff is a comparatively small corporation, and this expense was an enormous strain on its resources. As a large portion of this expense was unnecessarily forced upon plaintiff, $98,000 should be added to the $224,588.39 determined as reasonable royalty and $44,585.97 as interest, making a total of $367,174.36, to which interest at 5 per cent. from the date of the master's report should be added. Plaintiff will also recover the usual taxable costs in this case, including those of the accounting.

[7, 8] The concealment of the infringement by defendant and its predecessors before notice on September 9, 1920, and the continued infringement to a greatly increased extent after notice and knowledge thereof, do not warrant the award of treble damages, as requested by plaintiff, even though this court does not feel warranted in confirming the finding of the master as to defendant's liability for reasonable royalties prior to September 9, 1920. Nor is such increase warranted by the fact that defendant's superintendent, Moody, established a ravenizing plant in the factory of the Dura Company at Toledo, Ohio, in 1922, for the rust-proofing of articles produced for the Ford Motor Company.

A decree may be entered for $367,174.36, together with interest at 5 per cent. from the date of the master's report and taxable costs, in accordance with the above opinion. The exceptions to said report are sustained, in so far as is necessary to give effect to this opinion; otherwise, they are overruled.