## STANDARD OIL CO. OF CALIFORNIA v. TIDE WATER ASSOCIATED OIL CO.
### No. 40.

District Court, D. Delaware.

Dec. 2, 1943.

On Motion for Amended Findings and Judgment May 9, 1944.

Pillsbury, Madison & Sutro, Felix T. Smith, and Ralph R. Martig, all of San Francisco, Cal., Lyon & Lyon, Leonard S. Lyon, and Richard F. Lyon, all of Los Angeles, Cal., Thomas E. Scofield, of Kansas City, Mo., Southerland, Berl & Potter, of Wilmington, Del., and Charles M. Thomas, of Washington, D. C., for plaintiff.

Harris, Kiech, Foster & Harris, Ford W. Harris, Clarence F. Kiech, Ward D. Foster, and Ford W. Harris, Jr., all of Los Angeles, Cal., and Richards, Layton & Finger, of Wilmington, Del., for defendant.

WATSON, District Judge.

The complaint in this case charges the defendant and its predecessor in business, Associated Oil Company, with infringement of plaintiff's patents Nos. 1,705,809, 1,864,755, and 1,869,885. The answer and amended answers raise the usual issues as to validity and infringement and, in addition, plead that the defendant is licensee under the patents in suit. The latter defense has been separately tried and determined adversely to the defendant, 43 F. Supp. 47. The case came on for trial on the merits and is now before the court for disposition.

## Patent No. 1,705,809

At the time of trial, the plaintiff presented a motion for dismissal of the complaint, with prejudice as to the cause of action for infringement of Letters Patent No. 1,705,809. The plaintiff agreed that, because this was the second voluntary dismissal of a claim for infringement of this patent, the order of dismissal should be entered with prejudice. I find no valid objection to the entry of such an order and, therefore, the motion will be granted.

 The defendant contends that it is entitled to a declaratory judgment with respect to Patent No. 1,705,809 because of the prayer of its answer as amended, which reads so far as material as follows: "(b) That, if said Complaint is not dismissed with prejudice, the Court grant the Defendant declaratory relief as to each cause of action, * * *". The prayer for declaratory relief must be denied, first, because the dismissal of the cause of action is with prejudice and, therefore, satisfies the prayer of the answer as amended; second, the requirements of pleading require more than a mere prayer for declaratory relief to set forth a cause of action for a declaratory judgment; and third, the defendant has not offered sufficient proof to show that there is an actual controversy regarding infringement of this patent which will not be settled by dismissal with prejudice of the charges of infringement of this patent contained in the complaint. Accordingly, the prayer for declaratory relief will be denied with respect to Patent No. 1,705,809.

## Patent No. 1,869,885

 United States Patent to Davis & Hampton No. 1,869,885 in suit (hereinafter referred to as "885") relates to the refining of gasoline, and the process claimed therein is directed to the removal of sulphur bodies from cracked petroleum naphtha of gasoline type. Gasolines and other petroleum distillates are obtained from crude oil, which is an extremely complex mixture of hydrocarbons, of infinite variety, and differing widely in chemical structure and physical properties. These hydrocarbons are separated by distillation, advantage being taken of the fact that the hydrocarbons contained in crude oil differ widely in their boiling points, the lighter hydrocarbons boiling at lower temperatures than the heavier ones. Trade names have been assigned to various complex mixtures of these hydrocarbons, each mixture so designated having been obtained by fractional distillation, whereby hydrocarbons having boiling points within a certain range of temperature are collected as a distillate separate from that of hydrocarbons having higher or lower boiling points. Among the names assigned to these different distillates or fractions are gasoline, kerosene, lubricating oils, and the like. Gasolines, with which we are dealing here, consist of those hydrocarbons having boiling points within a range of temperature of approximately 100° F. to 427° F., the extreme limits of this range being subject to some variation.

Because of the harmful effect upon internal combustion engines of the presence of sulphur bodies contained in motor fuels it has been necessary for many years to remove a substantial portion of these sulphur bodies from gasolines produced from crude oils having a high sulphur content in order to obtain a finished product commercially satisfactory. Long prior to the filing of the application for the "885" patent, sulphuric acid had been widely used in the industry to refine gasoline and other crude oil distillates to remove part of the sulphur bodies as well as for other purposes. A conventional process of refining gasoline, both straight run and cracked, consisted of adding a predetermined quantity of sulphuric acid to the untreated gasoline stock; agitating the mixture of acid and gasoline; separating the gasoline and the viscous liquid or acid sludge, formed as a result of the acid treatment; neutralizing the gasoline; and redistilling the gasoline when the treatment required such re-distillation. The quantity of sulphuric acid used varied with different stocks treated, as well as with the quantity of sulphur bodies which were to be removed and was determined by routine tests.

Sulphur bodies in untreated gasoline containing sulphur bearing unsaturated hydrocarbons are removed by the action of sulphuric acid in two ways: first, by the solvent action of the sulphuric acid or acid sludge; and second, by polymerization of the sulphur bearing unsaturated hydrocarbons. Polymerization is a term used to describe the combination of two unsaturated hydrocarbons resulting in the formation of a hydrocarbon called a polymer having a boiling point higher than that of the original unsaturated hydrocar-

bons before combination. For some years prior to 1933, it was generally recognized in the industry that the non-sulphur bearing unsaturates were desirable motor fuel constituents, because of their anti-detonating or anti-knock qualities. Cracked gasolines produced by modern cracking methods contain large quantities (20% to 50%) of unsaturated hydrocarbons, and, in those gasolines obtained from high sulphur crudes, some of the unsaturated hydrocarbons contain sulphur while others do not. It was found in the conventional sulphuric acid treatment of cracked gasoline that the nonsulphur bearing unsaturates, and the sulphur bearing unsaturates, were polymerized in substantially the proportions that they were present in the untreated stock.

With the advent of increased production of cracked gasoline, the conventional acid treatment became unsatisfactory for those operators who were refining gasoline obtained from high sulphur crudes, because of high polymerization losses of valuable unsaturated hydrocarbons. This loss was occasioned by reason of the fact that the sulphur reduction of the cracked gasoline was accomplished almost entirely by polymerization, and where large quantities of sulphur bearing saturates were polymerized, in order to effect a sufficient sulphur removal to meet the requirements of the industry, a correspondingly large quantity of desirable unsaturates were polymerized. Upon redistillation of the treated gasoline, these polymers, because of their higher boiling point, no longer boiled in the gasoline range but remained in the still bottoms, and, insofar as the gasoline is concerned, were regarded as a treating loss.

Unsaturated hydrocarbons are extremely active chemically, and, when treated with sulphuric acid, a reaction takes place accompanied by the evolution of heat. When large quantities of unsaturated hydrocarbons are present, and the stock is subjected to a treatment with a comparatively large quantity of concentrated sulphuric acid, this heat of reaction may raise the temperature of the mixture of acid and gasoline, as much as 100° F. In the conventional treatment, the temperature at which the reaction took place was permitted to rise without restraint. Experiments conducted by Davis & Hampton revealed that if the heat of reaction were restrained, the polymerizing action of the sulphuric acid would be lessened, and a greater measure of the sulphur reduction would be accomplished by the solvent action of the acid. This is the alleged discovery, which is claimed in the "885" patent.

As a result of certain admissions of the plaintiff, claims 1, 2, 3, 5, 9, 10 and 11 of the "885" patent are the only ones involved in this proceeding. Claim 3, which may be regarded as a typical claim, reads as follows:

"3. A sulphur removing process of treating cracked naphthas of the gasoline type containing non-sulphur bearing unsaturated hydrocarbons and sulphur bearing bodies in which selective action of sulphuric acid of a strength not substantially less than 66° Baumè on the sulphur bearing bodies is depended upon, while excessive polymerization of the unsaturated hydrocarbons is prevented and consequent excessive loss of unsaturated hydrocarbons from the fuel undergoing treatment is avoided, which includes conducting such treatment under such temperature conditions as to limit the temperature of the reacting acid and fuel to a temperature at which the sulphur bearing bodies are selectively removable in the acid and below a temperature at which non-sulphur bearing bodies readily polymerize, whereby such selective action is secured coincident with the control of such polymerization." The only difference between the process described in the "885" patent and the conventional process in general use at the time of the application for the "885" patent is that the "885" patent requires that the temperature of reaction be controlled, while, in the conventional process, the temperature of reaction was permitted to rise without restraint. The patent recited that the reaction temperature may be controlled by cooling the gasoline prior to contacting the gasoline with sulphuric acid, by absorbing the heat of reaction, or by both methods. The claims of the "885" patent are limited to the maintenance of a reaction temperature "sufficiently low to permit a part of the sulphur bearing bodies to be selectively removed by said acids and below the temperature at which the non-sulphur bearing unsaturated hydrocarbons readily polymerize."

The defendant contends that the patent does not comply with the provisions of R.S. 4888, 35 U.S.C.A. § 33, in that the claims of the patent do not distinctly point out and define the invention claimed. In the application for the "885" patent, filed

November 30, 1927, a process was claimed wherein the maximum reaction temperature was reduced to a temperature adapted for the acid used and fuel treated. The original claims were disallowed by the examiner on the basis of certain prior patents, and amended claims were substituted which took the form, insofar as the description of the reaction temperature is concerned, shown in the above Claim 3. It is clear, therefore, that the claims of the patent cannot be construed to include a process in which the temperature of reaction is reduced or controlled to a temperature below that which would be reached by the acid treatment without such reduction or control because such a construction would make the claims as broad or broader than they were before amendment. Consequently, the temperature limitations contained in the claims of the patent must be so construed as to afford a clear and definite direction to one skilled in the art as to the range of temperatures at which the benefits of the invention may be obtained. In this regard it must be noted that the temperature of reaction is the very essence of the process of the "885" patent and its sole distinguishing feature from what is admittedly the prior conventional acid treatment process.

The temperature of treatment described in the claims of the "885" patent is fixed by two limitations; first, at a temperature "sufficiently low to permit a part of the sulphur bearing bodies to be selectively removed by said acids"; and second, "below the temperature at which the non-sulphur bearing unsaturated hydrocarbons readily polymerize". At first glance, both of these limiting phrases appear to be sufficiently definite to comply with R.S. 4888. However, when examined in the light of the evidence, this apparent clarity completely disappears. I shall discuss each limitation separately.

The first limitation restricts the operation of the process to that temperature at which a part of the sulphur bearing bodies are selectively removed. "Selective action" and "selectively removed", with regard to sulphur bodies, are terms used in the "885" patent with reference to the removal of sulphur bodies in the acid sludge; i.e., by the solvent action of sulphuric acid. It is stated in the "885" patent that, in the conventional treatment of gasoline with sulphuric acid, "nonsulphur-bearing bodies and sulphur bearing bodies are attacked by the acid and removed in the sludge in substantially the proportions existing in the oil", and, therefore, the proportion of sulphur to gasoline remained unchanged; i.e., there was no sulphur reduction at this stage of the operation. Selective action, which is the action of sulphuric acid whereby sulphur bodies are selectively removed, may be defined as the effect obtained by performing "the acid treatment of motor fuel under such conditions that the acid does not act upon the sulphur-bearing bodies and the nonsulphur-bearing bodies merely in the same proportion as exist in the untreated oil, but acts relatively to a greater extent upon the sulphur-bearing bodies than on the non-sulphur-bearing bodies." In order to determine whether or not this effect has been achieved it is indicated that appropriate tests should be made of the untreated gasoline to determine the sulphur content thereof, and to perform similar tests of the gasoline after acid treatment and before redistillation to determine the sulphur content of the treated gasoline. If the treated gasoline has a lower percentage sulphur content than the untreated gasoline "selective action" has been obtained. This decision is complicated by the fact that the action of sulphuric acid is affected by a great number of factors; the stock treated, amount of sulphur reduction desired, quantity of sulphuric acid used, the concentration of the sulphuric acid, and the time of contact between the acid and gasoline. None of these factors are referred to in the claims of the "885" patent, except the strength of the acid which is fixed as "not substantially less than 66° Baumè". The evidence discloses that variations of these factors greatly affect the action of sulphuric acid upon gasoline. It was evident that the plaintiff's experts, the patentees, and the plaintiff's skilled employees, were unable to state the temperature at which selective action could be obtained. In fact, one of the plaintiff's witnesses testified that in large commercial operations wherein sludge is recirculated, and a two or three-stage counterflow operation is employed, sulphur bodies which were "selectively removed" in the sludge are returned to the gasoline, thus "masking" the fact that selective action has been obtained. Hence, in a commercial operation, by performing the tests indicated in the patent, the operator could not be sure whether or not he was conducting the acid treatment within the temperature established by the first limitation of the "885"

patent. Another factor, and one which is perhaps most important, is that different gasoline stocks are acted upon in entirely different manners and, whereas comparatively low temperatures must be employed in treating some stocks before selective action is obtained, in other untreated stocks selective action is obtained without any temperature reduction. It is obvious, therefore, that the first limitation is not sufficiently definite to enable any one to determine whether or not the teachings of the patent are being followed.

I now must return to the second limitation to find out what is claimed. The second limitation fixes the temperature of reaction to one "below the temperature at which, the nonsulphur-bearing unsaturated hydrocarbons readily polymerize." The vice of this limitation lies in the use of the word "readily". There have been many instances where the courts have upheld patents containing comparative terms, but I have found none which indicates approval of comparative terms in cases similar to this one now under consideration. The above-mentioned factors affecting the action between sulphuric acid and gasoline reach paramount importance when considering polymerization. Changes in any one of these factors is sufficient to produce widely varied results insofar as polymerization is concerned. An examination of acid treatments at temperatures within the range used by the patentees to illustrate the application of their invention reveals a wide range of polymerization losses running from as low as 2% to as high as 17%. While there are no examples of conventional treatments in which polymerization losses were as low as 2%, there are many examples where the polymerization losses were less than 17%. I have been unable to conceive of any test whereby an operator could determine whether or not the temperature of treatment was below that at which unsaturated hydrocarbons readily polymerize.

The evidence shows that the rate of polymerization increases uniformly from 0° F. to 80° F. and, presumably, above 80° F. Consequently, there is no point at which there is such a marked change in the rate of polymerization as to lend even a slight measure of clarity to the limiting phrase used in the patent.

The plaintiff points out that the patent contains many examples of treatments which are illustrative of the invention, and are sufficient to enable an operator to practice the process claimed. It is, perhaps, true that an operator having a stock of similar physical properties to one of the examples might be able to practice the invention by treating at a temperature within the range used by the patentees in the examples shown in the patent. However, it is specifically stated in the patent that the examples are illustrative only and "the application of our invention is not limited to the particulars of any of said examples." Hence, it is obvious that the examples cannot make definite those limitations which, by the express terms of the patent, are not limited to any of the particulars of the said examples. Consequently, the claims of this patent violate the rule expressed in General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 902, 82 L.Ed. 1402, that "The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not'. The claims 'measure the invention.' Patentees may reasonably anticipate that claimed inventions, improvements, and discoveries, turning on points so refined as the granular structure of products, require precise descriptions of the new characteristic for which protection is sought. In a limited field the variant must be clearly defined." I feel compelled to hold that claims 1, 2, 3, 5, 9, 10, and 11 of the "885" patent fail to comply with the provisions of R.S. 4888, 35 U.S.C.A. § 33, and that, for that reason, the patent is invalid. However, even if the claims of the "885" patent were held to be sufficiently definite to comply with the provisions of R.S. 4888, I believe that the patent is invalid for want of novelty and of invention.

In 1909 a patent was granted to Robinson, U. S. Patent No. 910584. This patent disclosed a process for refining a kerosene obtained from Lima oil, or Lima petroleum. Lima oil at that time was the only well known U. S. petroleum having a high sulphur content. The Robinson patent sets

forth and claims a process for reducing the sulphur content of the distillate, or of a kerosene distillate, obtained from an analogous crude oil. The kerosene distillate treated in the Robinson patent is described as that fraction which distills over between 300° F. and 550° F. The Robinson patent also discloses that the processes adapted to the treatment of a cracked as well as an uncracked distillate, and the concentration of the sulphuric acid is stated to be an acid stronger than that of 66° Baumè. Without discussing in detail each and every step of the process disclosed in the Robinson patent, it is clear that the process of the "885" patent, and the process of the Robinson patent, are substantially identical, with the exception, perhaps, of the provisions relative to the temperature of treatment. There are only two points wherein the Robinson patent differs sufficiently from the "885" patent to warrant discussion, and they are the nature of the distillate treated and the provisions relative to temperature of treatment.

As is indicated by the temperature range of the kerosene indicated above, only a portion of the distillate treated by Robinson is within the boiling point range of the distillate referred to in the "885" patent. I believe, however, that this difference is not material. First, because the difference in boiling point range is not sufficiently great to affect the application of the process; and, secondly, it is stated on page 6 of the application of the Robinson patent that the process is adapted to the treatment of hydrocarbons lighter than the fraction described as kerosene. There is ample disclosure in the Robinson patent that the patentee believed that the process was adapted to the treatment of all of the lighter fractions of the high sulphur crudes. The Robinson patent also sets forth samples of treatments of the lighter end of the kerosene distillate, which is comparable to the heavier end of the distillate treated in the "885" patent, revealing that the process of the Robinson patent gave beneficial results.

The Robinson patent in reality deals with three separate processes, only one of which is here material, and that is, the treatment of the distillate at reduced temperatures. Although the Robinson patent speaks of a cracked distillate, it is apparent that the cracking processes to which he referred did not produce a cracked distillate containing the high percentage of unsaturated hydrocarbons which are produced by modern cracking methods and considered in the process of the "885" patent. The presence of unsaturated hydrocarbons in the untreated distillate produces two results upon acid treatment; first, the reaction between the acid and the unsaturates causes a rise in temperature of the mixture of considerable magnitude; and second, the appearance of, or increase in, losses due to polymerization. The first of these results was not present in the treatments conducted by Robinson, as is shown by the fact that he found an increase of only 10° F. during the treatment. There is no reference to the second result and, if there were any polymerization losses, Robinson failed to note that fact.

With regard to the temperature of treatment, Robinson recommends an initial temperature of less than 60° F. and of about 38° F. But, although the recommendation of Robinson relates only to initial cooling, it is clear from the reading of the patent that the temperature of reaction was the essential consideration of the process; hence, with the initial temperatures disclosed in the Robinson patent, the treating temperatures recommended range from 48° F. to 70° F. This range includes a portion of the temperature range used in the "885" patent to illustrate the teachings of that patent. In the specification of the Robinson patent, it is indicated that the use of temperatures below 38° F. initial, would reveal the same desulphurizing effect, although Robinson indicates that the expense involved would not be justified by the results achieved. Although Robinson refers particularly to the initial temperature of the oil, he discloses that the temperature may be restrained during the reaction, but does not recommend it on the ground that it will be an unnecessary expense. It seems obvious, therefore, that Robinson's process is substantially the same as the process in the "885" patent. This identity is further shown by a comparison between the description of selective action in the "885" patent and Robinson's explanation of the result achieved by his process. Robinson states that "The explanation of the ability of a smaller proportion of 98% or other extra strong acid, when applied to Lima oil at about or below 38° F. or at other temperature substantially below about 60° F. initial, to accomplish the same desulphurizing effect as a larger proportion of the same acid, when applied to the same stock at about 60° F. initial or at any lower tem-

perature which is yet above 38° F. and also above that at which the smaller proportion of acid is used, consists in the fact (as I believe) that the affinity of 98% or other extra strong acid for the sulphur compounds of Lima oil is diminished by such decrease in temperature less than its affinity for the unsulphured hydrocarbons of Lima oil is diminished thereby. The chemical energy of the 98% or other extra strong acid expends itself, I believe, at all the temperatures both upon the said sulphured and the unsulphured compounds; but the ratio in which it acts upon them, respectively, is different at the different temperatures; and the larger proportionate expenditure is upon the sulphur compounds at the lower temperatures herein above set forth."

This explanation is substantially the same as the definition in the "885" patent of the term "selective action". Hence, assuming that the two processes are identical, the fact that Davis & Hampton discovered an unexpected result of the operation of the Robinson process, that is, reduction of polymerization losses, does not render the "885" patent valid. Red River Refining Co. v. Sun Oil Co., D.C., 29 F.Supp. 636, 640, affirmed 3 Cir., 112 F.2d 575.

The plaintiff has attempted to show that using initial temperatures referred to in the specifications of the Robinson patent would not sufficiently reduce the reaction temperature to produce beneficial results treating gasolines cracked by modern methods. This fact would seem obvious. However, it would appear equally obvious that an operator employing ordinary skill in the practice of the Robinson process would realize that the temperature rise was excessive, and would reduce the reaction temperature to that indicated by the teachings of the Robinson patent; viz.: 48°,F. to 70° F. or lower, according to the expense involved and the savings obtained. Robinson is not alone in teaching that the expense involved in reducing the temperature is an important factor in determining the temperature of treatment. It is stated in the "885" patent (page 6, lines 91–109) that the relative cost of cooling and value of gasoline saved are to be considered in selecting a treating temperature.

The plaintiff has pointed out that the Robinson patent was carefully considered by the Patent Office in connection with the proceedings leading up to the grant of the "885" patent, and that such fact should be given great weight in the determination of the validity of the "885" patent. For that reason, I shall discuss other teachings of the prior art although I am convinced that the "885" patent is completely anticipated by the Robinson patent. It should be noted, however, that claim 3 (originally claim 17) was allowed over the Robinson patent only after certain affidavits were filed by noted chemists, which affidavits, after careful study and consideration in the light of the evidence received in this case, are not persuasive.

The restraint or reduction of reaction temperature in the refining of petroleum distillates is old in the art. As early as 1895, it was recommended that the reaction temperature in refining kerosene with sulphuric acid be restrained, and reference is made to the fact that certain commercial operations in Germany were then being conducted with temperature control. Prof. R. Zaloziecki, Chemiker Zeitung, Vol. 19, No. 5 and No. 38. Many other articles were introduced in evidence wherein the importance of reaction temperature was noted. At these early dates, the light petroleum fractions in which the refiners were interested were sold as kerosene and included only a portion of what is now sold as gasoline, and there is no indication that the industry was interested in the removal of sulphur as such, but rather was interested in the color and odor of the refined product, sulphur being only one of the many offending materials. However, these articles do show that the importance of the temperature of treatment in refining had received considerable consideration.

The fact that a reduction of the temperature at which the treatment of gasoline with sulphuric acid is conducted will reduce the polymerization of unsaturated hydrocarbons was well known to the petroleum refining industry in 1923. Reference is made to this fact in "The Technology of Mineral Oil and Its Products", compiled by Dr. Leopold Singer et al., published by S. Hirzel (1911), pages 482–7, as well as in the application of Isham & Lyons, filed October 30, 1923, Patent No. 2145025. The plaintiff's witness, Ralph A. Halloran, who was in charge of plaintiff's research department at the time of the experimental work leading to the alleged discovery of the process described in the "885" patent, testified that

he knew prior to this experimental work that the rate of polymerization would be reduced by a reduction in temperature of reaction, and that this knowledge was based upon a fundamental rule in the field of chemistry relative to chemical reaction. In fact, the affidavits submitted by Davis & Hampton to the Patent Office during the course of proceedings involving the application of the "885" patent, particularly that of Leslie, indicate that the affiants found nothing novel in the fact that the reduction of temperature recommended by the "885" patent caused a reduction of polymerization losses. Consequently, the process described in the "885" patent is valid only if Davis & Hampton exercised inventive skill in discovering that adequate sulphur removal could be effected at such reduced temperature. It should be remembered that sulphur reduction was the desired result of the process of the "885" patent as well as of the conventional process, and that the particular problem which David & Hampton sought to solve was the polymerization losses which accompanied the conventional acid treatment. In view of the fact that it was well known and should have been obvious to a skilled chemist that these losses could be reduced if not entirely avoided by restraint of the reaction temperature, the process of the "885" patent rises to the dignity of invention only if the prior art did not indicate that sulphur removal could be satisfactorily attained at such reduced temperature. The prior art clearly showed that sulphur reduction could be effected at reduced temperatures. The outstanding example of such a disclosure in the prior art is the Robinson patent discussed above, which taught that sulphur reduction is improved by temperature reduction. A similar disclosure appears in the patent granted to Black in 1910 No. 968,640. In the Black patent, the distillate treated included a cracked kerosene fraction obtained from California oil, and the treating temperature recommended was from 40° F. to 60° F. The treating agent mentioned (The Black patent) is sulphuric anhydride, which is a sulphuric acid stronger than 66° Baumè. Reference to sulphur reduction is specifically made in the Black patent.

■ The evidence received shows beyond question that in the light most favorable to the plaintiff, the process of the "885" patent consists only of applying an old process to a new use which new use is clearly indicated, not only by written publications but by familiar rules of chemistry, and such application does not involve invention.

My conclusion, therefore, is that the claims here involved of the "885" patent are invalid for want of novelty and invention.

### Patent No. 1,864,755

■ United States Patent to Osmer and Craise, No. 1,864,755 in suit (hereinafter referred to as "755") relates to the removal of the acid sludge formed by the sulphuric acid treatment of petroleum oil. The patent contains eight claims of which only claims 1, 2, 3 and 4 are involved in this proceeding.

Claims 1, 2, and 3 are process claims. Claim 1 reads as follows: "1. A continuous process of removing finely divided suspended sludge from petroleum oils comprising, forming a porous bed of solid nonabsorbent insoluble material capable of being preferentially wetted by the sludge, the pores formed in such bed being of sufficient size to prevent sludge films formed on the surfaces of the insoluble material from completely filling such pores, passing an oil containing suspended sludge upwardly through such porous bed, coagulating the sludge upon the surfaces of such bed, discharging sludge-free oil from an upper portion of such bed and allowing sludge coagulated upon the solid surfaces to flow downwardly through such bed."

Claim 2 differs from Claim 1 in that it contains a provision relative to the velocity of the flow of oil and sludge as follows: "A velocity insufficient to counteract a simultaneous downward flow of coagulated sludge through said bed of material." Claim 3 differs from Claim 1 in that it contains the following provision relative to the velocity of the flow of oil and sludge: "under conditions of oil flow insufficient to carry off the coagulated sludge together with the oil and insufficient to prevent a substantially countercurrent flow of coagulated sludge through such bed."

The treatment of petroleum oil with sulphuric acid results in the formation of a viscous liquid known as an "acid sludge". Before the oil can be sold commercially, the acid sludge must be completely removed from the treated oil and the oil must be neutralized. A large portion of the sludge formed by the acid treatment is present in the oil in large droplets which settle

out of the oil very readily upon standing and collects at the bottom of the settling tank, but a substantial amount of the sludge remains suspended in the oil in a relatively finely divided state and must be removed by further treatment. The process of the "755" patent is directed to the removal of the acid sludge and is particularly directed to the removal of the finely divided sludge particles which do not readily settle out. The process consists of passing oil upwardly through a porous bed of suitable composition which bed collects the finely divided sludge particles and causes them to coagulate and the droplets of sludge thus formed settle to the bottom of the treating chamber and are removed. The oil from which the sludge has been removed passes out of the top of the treating chamber.

There are a number of critical factors affecting the removal of sludge by this process. Among them are the size of the voids or spaces in the packing material and the rate of flow of the oil.

The size of the voids in the filtering bed is important for two reasons: first, if the voids are too small, the sludge which coagulates upon the surface of the packing material will tend to fill the voids with a film of sludge and clog the apparatus, thus preventing the continuous operation of the process; and second, if the voids are too large, there may not be sufficient contact between the oil and the bed to effect a satisfactory removal of sludge. An example of the second reason is revealed in the evidence relating to Bottle No. 3 of defendant's treating plant. This bottle was filled with approximately 41,000 three-inch raschig rings and the evidence shows that only about fifty percent. of the sludge in the oil charged to the apparatus was removed by the bottle. The only explanation for the failure of this bottle to remove all of the sludge is that the voids in the packing material were so large that there was insufficient contact between the treated oil and the packing material to effect a complete removal of the sludge. If such packing material could effect complete sludge removal, it is apparent from the testimony that an enormous bed of such rings would be required.

The velocity of the oil is important because, if the oil moves too rapidly through the packing bed, it will tend to tear the coagulated sludge particles from the packing material and carry them along with the oil out of the separating tank instead of permitting the coagulated sludge particles to settle to the bottom of the tank.

The claims of the patent with regard to these factors are purely functional in that they describe only the result to be achieved. The evidence shows that the treatment of various petroleum oil distillates with sulphuric acid results in the formation of sludges of vastly different viscosities requiring different oil flow velocities and different void sizes in the packing bed, but the patent fails to state any method by which an operator may ascertain the proper oil velocity and void size to enable him to practice the teachings of the patent. In fact, the plaintiff's witnesses were unable either from the teachings of the patent or from their experience to state what oil velocity or void size would be required to remove sludge formed by the acid treatment of the various types of petroleum distillates. It is, therefore, apparent that the claims of the "755" patent are not sufficiently definite to comply with the requirements of R.S. 4888, 35 U.S.C.A. § 33, and are, therefore, invalid.

However, assuming that the velocity of the flow of oil and the size of the voids in the packing bed could be ascertained without undue difficulty by the operator, the claims in suit are, nevertheless, invalid for want of invention.

The process of the "755" patent is essentially one of coagulation of the particles of sludge suspended in the oil. It was well known, and even obvious, to those familiar with the art that large droplets of sludge would settle out of the oil through the force of gravity. It was also well known that finely divided particles of sludge suspended in the oil could be collected into droplets sufficiently large to separate out of the oil by gravity through coagulation obtained by mechanical means. In the United States patent to Kendall No. 359357, oil containing finely divided particles of acid sludge was passed upward through a bed of metal pins, and the specifications state that "During its passage all suspended viscous bodies will be abstracted by the pins. P will aggregate into slimy masses, drop down and collect on the upper surface of the spiral plate, and gradually slide down and fall to the bottom of the tank C."

The prior art contains many other instances of separation of finely divided im-

purities in a fluid by means of coagulation of the impurities. In U.S. Patent to Meredith, No. 1,480,091, water was removed from a water-oil emulsion by means of a bed of sand, which the patentee points out is wetted by the water, and the finely divided water particles are collected on the surface of the sand forming droplets, which are separated from the oil by settling. The British patent to Mackey, No. 11,410, discloses a process for filtering dye water by passing the fluid upwardly through a bed of charcoal. The contaminating material collects on the outside portions of the charcoal and settles to the bottom of the chamber. The United States patent to Gardner, No. 1,668,766, describes a process for removing water from an oil water emulsion by passing the effluent upward through a packing bed composed of fibrous material. Gardner states in his specifications that the finely divided particles of water are collected by the packing bed and settle to the bottom of the treating tank, and the purified oil passes out at the top of the treating tank.

Although only one of the patents cited above deals with the problem of sludge removal, I believe that all of the patents cited are a portion of the pertinent art which, in this case, is filtration. This belief is further strengthened, particularly with regard to the patents relating to water-oil emulsions, by the fact that Osmer & Craise regarded the breaking of water oil emulsion as a problem allied with that of sludge removal. The evidence discloses that at approximately the same time that Osmer & Craise were conducting their experimental work relative to the process of the "755" patent for removing sludge, they were conducting experimental work with the same process for the purpose of removing water from water-oil emulsions. Furthermore, a consideration of the Meredith patent and the Gardner patent, in the light of the teachings of the Kendall patent, reveals the similarity between the two problems.

Thus, every element of the "755" patent is revealed in the prior art—upward filtration; coagulation of the impurities; settling out of the coagulated impurities by gravity and countercurrent to the flow of the liquid to be filtered. The patentees of the "755" patent have not introduced any new element, new mode of action, or new result. It is true that the "755" patent contains reference to the size of the voids in the packing material and to the rate of flow of the oil, but these references, even if sufficiently definite to warrant consideration, amount to nothing more than a general direction as to factors inherent in the operation of the process which is itself old in the art.

Claim 4 of the "755" patent is an apparatus claim and reads as follows: "4. An apparatus for separating, suspended liquid sludge particles from petroleums comprising, a chamber, a bed of solid non-absorbent packing material within said chamber containing voids of sufficient size to prevent clogging by suspended sludge particles under operating conditions of oil flow there-through, a sludge outlet from the lower portion of said chamber, an oil outlet from the upper portion of said chamber and an inlet for oil containing suspended sludge leading into said chamber vertically between said oil and sludge outlets."

This claim is open to the same objection with regard to definiteness as are claims 1, 2, and 3. However, it is unnecessary to base the determination of the validity of this patent on that ground alone.

The apparatus described in Claim 4 of the "755" patent is little more than a description of the apparatus disclosed in the Gardner patent, substituting, however, a packing material adapted to the effluent treated. Or, regarded in another way, the patentees of the "755" patent have merely substituted the packing bed of the Meredith patent in the apparatus of the Gardner patent. In either event the apparatus does not constitute a sufficient advance in the art to be considered an invention. The defendant has cited a number of other prior art patents which disclose the apparatus of Claim 4 of the "755" patent. However, I feel it unnecessary to discuss all of those patents here. In general, they disclose a bed of packing material such as that specified in the "755" patent and a mode of operation substantially similar to the mode of operation of the "755" patent. United States patent to Raschig No. 1,141,-266; French patent to Barbet, No. 449,960; and United States patent to Pooler No. 626,244.

It is my conclusion that the patentees have merely adapted elements old in the art to the requirements of sludge removal and that these elements do not function in any new way nor do they produce a new or different result. Consequently, the

patent is void for want of invention. Standard Brands v. National Grain Yeast Corp., 101 F.2d 814, 822, where Judge Biggs, speaking for the Circuit Court of Appeals, 3rd Circuit, said: "Since the component parts of the process set out by the patent are old it follows that a combination of these processes contain no novelty and the patent is void for want of invention."

The statements of fact found in the foregoing discussion may be taken as findings of fact of the court supplementing the formal findings of fact filed herewith.

In view of the findings of invalidity of the claims of the patents in suit, it is "unnecessary to discuss the question of infringement or make findings relative thereto."

My conclusions of law are:

1. Plaintiff is the owner of the entire right, title and interest in and to United States Letters Patent No. 1,864,755 and No. 1,869,885.

2. Plaintiff's motion to dismiss with prejudice its claim for infringement of United States Letters Patent No. 1,705,809 is proper and should be granted.

3. Defendant's prayer for a declaratory judgment as to the Plaintiff's claim relative to United States Letters Patent No. 1,705,809 should be denied.

4. Claims 1, 2, 3, 5, 9, 10 and 11 of United States Letters Patent No. 1,869,885 are invalid for want of novelty, invention and for failure of compliance with the provisions of R.S. 4888, 35 U.S.C.A. § 33.

5. Claims 1, 2, 3 and 4 of United States Letters Patent No. 1,864,755 are invalid for want of invention and for failure of compliance with the provisions of R.S. 4888, 35 U.S.C.A. § 33.

6. Defendant is entitled to a dismissal of the action with costs.

Now, December 2, 1943, the plaintiff's motion to dismiss the complaint with prejudice as to the cause of action for infringement of Letters Patent No. 1,705,809 is granted, and the complaint is dismissed with prejudice as to the cause of action for infringement of Letters Patent No. 1,705,809, defendant's prayer for a declaratory judgment as to plaintiff's claim relative to United States Letters Patent No. 1,705,809 is denied, and this action is dismissed with costs.

On Motion for Amended Findings and Judgment.

This matter is before the court upon motion of the defendant to amend and supplement findings of fact and conclusions of law, and to make additional findings and conclusions and amend the judgment.

The first amendment requested by the defendant relates to a clerical error which has already been corrected. The second request is that the judgment of the court be amended by adding the patent numbers of the patents as to which the judgment applies. The language used by the court "This action is dismissed with costs" is undoubtedly proper, and is the proper form of judgment in the case. The order for dismissal in this case operates as an adjudication upon the merits. Rule 41(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The judgment certainly dismissed the action as an entirety. However, it will do no harm to grant defendant's request, and same will be granted.

The balance of defendant's requests all relate to the same issue and will be considered together. The issue is, whether the defendant shall recover from the plaintiff its costs and expenses incurred in the preparation of its pleadings and defenses and in preparation for trial with regard to patent No. 1,705,809.

When this matter was called for trial, the plaintiff presented a motion for dismissal of the complaint with prejudice as to the cause of action for infringement of this patent and the order entered did dismiss the cause of action with prejudice.

It is defendant's contention that the plaintiff knew, or should have known, when the action was commenced in this court, that it had no cause of action against the defendant for infringement of patent No. 1,705,809, and that the bringing of the action caused the defendant to incur large expenses for which it should be reimbursed by the plaintiff.

The facts are these: Plaintiff originally brought suit against the defendant on July 27, 1937 in the Northern District of California. In that suit the plaintiff asserted infringement of the same three patents here involved. In that suit, plaintiff served interrogatories upon the defendant. In these interrogatories the plaintiff sought information as to defendant's acts and the defendant's answers

286

disclosed that the defendant had not employed and did not intend to employ the sulfuric acids and the temperature to which patent No. 1,705,809 was directed.

On March 13, 1939 the suit in the Northern District of California was dismissed, upon agreement of the parties, without prejudice and without costs to either party. The present suit was commenced on April 25, 1939. Prior to trial interrogatories were propounded to defendant by plaintiff. In answer to these interrogatories defendant again set forth that it did not employ and did not intend to employ sulfuric acids and the temperature to which patent No. 1,705,809 was directed. On July 20, 1942 plaintiff, in its answers to interrogatories propounded by defendant, set forth that, in view of defendant's answers indicating that defendant never employed the processes dealt with by the patent in question, the plaintiff would dismiss the charge of infringement as to this patent. This was the first indication given by the plaintiff to the defendant that it would move to dismiss its charge of infringement of patent No. 1,705,809.

■ The power of a court of equity to allow costs and expenses other than those which ordinarily follow judgment in appropriate cases is no longer subject to question. Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; Parker Rust Proof Co. v. Ford Motor Co., D. C., 23 F.2d 502; Guardian Trust Co. v. Kansas City Southern R. Co., 8 Cir., 28 F.2d 233. In the last case, Judge Booth, of the Circuit Court of Appeals for the Eighth Circuit, reviewed the authorities at length and outlined in detail the types of cases and the circumstances in which such costs and expenses may be allowed.

In Parker Rust Proof Company v. Ford Motor Co., supra, costs and expenses of the type requested in the case at bar were allowed to the plaintiff where the character of the defense was such that plaintiff was put to unusual expense to meet it. The case was a most unusual one where it appeared that the defendant had deliberately put the plaintiff to the greatest expense possible in proving its case, in accordance with defendant's settled policy of recognizing no patents and making litigation for patent holders so expensive as to discourage suits for infringement against the defendant.

A case similar to the Parker Rust Proof Co. case is Gazan v. Vadsco Sales Corporation, D. C., 6 F.Supp. 568. In that case, defendant was allowed an additional allowance of costs where it appeared that the plaintiff had allowed his name to be used in the bringing of a stockholders' suit which had no basis and which was vexatious and oppressive. The plaintiff had never read the complaint, did not know what it contained and was unaware of the charges made; he had not contributed to the expense of the litigation, did not know any of the information contained in the complaint, did not give such information to the plaintiff's attorney, and did not know in what manner his counsel had obtained the information upon which the complaint was allegedly based.

■ I have found no case in which additional costs and expenses have been allowed to a litigant in circumstances similar to those in the case at bar. There is nothing from which it at all appears that the suit brought by the plaintiff here was either vexatious or oppressive. On the other hand, this suit was apparently brought by the plaintiff for the purpose of protecting what it had good reason to believe were its legitimate legal rights. All three of the patents sued upon were related and the enforcement of plaintiff's rights under these patents, if valid, was legitimate use of legal process.

The only act on the part of the plaintiff of which the defendant complains consists of prosecution by plaintiff of suit for infringement of one of the patents involved after plaintiff was assured by defendant that it was not infringing that patent. In other words, it is defendant's position that plaintiff should have taken it at its word when, in answer to interrogatories, it denied the use of one of the three patents sued upon. It does not appear that plaintiff had absolute knowledge that defendant was not using the process referred to in the patent prior to the time it informed the defendant that suit on the patent in question would be voluntarily dismissed. All that appears is that the defendant denied use of the patent some five years before plaintiff accepted the denial as a fact and voluntarily dismissed its suit.

It is my conclusion that in the case at bar there are no circumstances which would justify any imposition on the plaintiff of additional costs and expenses.

Therefore, defendant's request for amendment with respect thereto will be denied.

Now, May 9, 1944, after due consideration of defendant's motion filed December 13, 1943, and in accordance with opinion this day filed, it is ordered that the judgment entered in the above-entitled proceedings be amended to read as follows:

The plaintiff's motion to dismiss the complaint with prejudice as to the cause of action for infringement of Letters Patent to No. 1,705,809 is granted, and the complaint is dismissed with prejudice as to the cause of action for infringement of Letters Patent No. 1,705,809, defendant's prayer for a declaratory judgment as to plaintiff's claim relative to United States Letters Patent No. 1,705,809 is denied, and this action is dismissed as to Patents Nos. 1,705,809, 1,869,885 and 1,864,755 with costs.

And it is further ordered that as to all other requests set forth in defendant's motion filed December 13, 1943, said motion is denied.